IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| JOHN S. BENNETT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  Civil Action No. _____ |
| | ) |
| JAMES GARNER, | ) |
| 47864 Allegheny Circle | ) |
| Potomac Falls, VA 20165 | ) |
| | ) |
| Defendant. | ) |
| | ) |

## COMPLAINT

COMES NOW John S. Bennett ("Bennett" or "Plaintiff"), by counsel, and files this Complaint against the defendant James Garner ("Garner" or "Defendant"). Stating as follows:

## PARTIES

1. Plaintiff is an individual who resides in Montgomery County, Maryland.

2. Defendant is an individual who resides in Loudoun County, Virginia.

## JURISDICTION / VENUE

3. For purposes of 28 U.S.C. § 1332(a), Plaintiff is a citizen of Maryland.

4. For purposes of 28 U.S.C. § 1332(a), Defendant is a citizen of the Commonwealth of Virginia. The Plaintiff is a citizen of a state in which the Defendant is not domiciled. The amount in controversy exceeds $75,000, exclusive of interest and costs. Therefore, this Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).

Jeffery T. Martin, Jr., VSB #71860
HENRY & O'DONNELL, P.C.
Counsel to John S. Bennett
300 N. Washington St., Suite 204
Alexandria, VA 22314
(703) 548-2100

5. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) and (2) because the Defendant resides in Virginia and a substantial part of the events or omissions giving rise to the claim occurred, and a substantial part of property that is the subject of this action is situated, in Virginia.

## INTRODUCTION

6. As set forth below, Bennett is the holder of a $262,500.00 judgment against Garner's 100% owned entity, Virtus Consulting, LLC ("Virtus"). The judgment arises from an arbitration award for breach of contract stemming from Virtus' breach of an agreement with Bennett under which Bennett was to be paid certain amounts upon the successful closing of a lucrative sale of the principal assets of Virtus. The sale concluded and closed, but Bennett was not paid amounts owed because Garner had orchestrated the sale of Virtus' assets in such a manner as to transfer literally *all* valuable consideration from such sale to himself. Additionally, Garner caused Virtus to transfer approximately $240,000.00 in remaining cash reserves to himself at a time when Virtus owed contractual liabilities to Bennett, thereby denuding Virtus of any and all assets from which payment of the obligations owed to Bennett could be made. In orchestrating these clearly related transactions, Garner fraudulently induced Bennett to enter into a contract under which Bennett provided assistance and consideration critical to the proposed sale of Virtus' assets in exchange for a promise of payment of fixed and percentage fee amounts upon the successful completion of sale. However, instead of negotiating and performing a sale of assets under which proper consideration would have been paid to Virtus as seller, Garner orchestrated the sale in such a manner as to effect the payment or delivery of virtually *all consideration* to Garner personally. In transferring substantially all value of company assets to himself personally, Garner has treated Virtus as his instrumentality or *alter-ego* to disguise

wrongs perpetrated by him. As a result of this intentionally fraudulent behavior, Bennett has been damaged and is now seeking to recover from Garner directly as i) Virtus was merely his alter ego, ii) Garner fraudulently induced Bennett to enter into a contract with Virtus knowing that Virtus would not be able to meet its obligations, and iii) Garner and Virtus engaged in fraudulent and voluntary transfers that left Virtus unable to pay its just debt to Bennett.

## FACTS COMMON TO ALL COUNTS

7. Virtus is a Virginia limited liability company, founded in 2007, with a principal place of business in Loudoun County, Virginia. At all relevant times Virtus is and has been 100% owned and managed by Garner.

8. Virtus was a company engaged in providing management consulting services, primarily in the areas of accounting, accounting systems and related fields. As the principal component of its business operations, Virtus entered into service contracts with various financial institutions for the provision of management and financial consulting services. One of the largest and most significant contracts held by Virtus was a consulting contract with Capital One Services, LLC ("Capital One").

9. In 2012, Bennett was a key employee of Virtus, was entirely responsible for the origination of Virtus' contract with Capital One (the "Capital One Contract"), and was largely responsible for the retention and management of the Capital One Contract. Bennett brought the Capital One Contract opportunity to Virtus when he was hired by the company in 2011, and served as the principal contract relationship until the Capital One Contract was transferred as part of the sale of Virtus' assets in late 2012.

10. Virtus was a successful and profitable company, with gross revenues in 2012 exceeding $2,700,000 generated principally from its consulting contracts. At all times relevant to

the facts of this case, Garner reported all taxable income for Virtus on his personal federal income tax returns on a Schedule C attached to his 1040 return.

11. During 2012, Garner began negotiating with the Solomon Edwards Group ("SEG") in an attempt to sell SEG substantially all the assets of Virtus, which consisted at that time primarily of i) the consulting contracts with Virtus' clients, ii) accounts receivable from the consulting contracts, and iii) all goodwill, customer lists and customer contacts relating to Virtus' consulting business.

12. Virtus' Capital One Contract was very lucrative, and was required by SEG to be a part of any sale of assets to them. Because Bennett had originated the Capital One Contract and was then still the principal point of contact within Virtus with respect to the client relationship, Bennett's cooperation in facilitating and effecting an assignment of the Capital One Contract was a critical requirement to completion of any sale of Virtus' assets to SEG.

13. In order to induce Bennett to continue his employment with Virtus through a date certain and to assist with the sale and assignment of existing contracts to SEG (including the Capital One Contract), Garner proposed that Virtus would share the proceeds of the sale with Bennett.

14. To memorialize this agreement, on September 22, 2012, Virtus, Garner, and Bennett signed and executed a three-party contract (the "Bennett Agreement") providing for certain payments to be made to Bennett conditioned upon i) the successful close of a sale of Virtus' assets to SEG by September 30, 2012 "or soon thereafter," and ii) Bennett's continued employment with Virtus up to and until the date of such closing. Payments required to be made to Bennett under the Bennett Agreement consisted of the following:

a. <u>Up Front Cash Payment</u> – A total of $175,000.00 to be paid by Virtus in quarterly installments every 90 days commencing 30 days after closing; and

b. <u>Earn Out Payment</u> – A total of $300,000.00 to be payable by Virtus in the amount of $175,000.00 during the first year after closing, and $125,000.00 payable by Virtus *and* Garner during the second year after closing.

Bennett Agreement at par. 4. A true and correct copy of the Bennett Agreement is attached hereto as **Exhibit A** and is hereby incorporated by reference.

15. Bennett performed his obligations under the Bennett Agreement, including leveraging his client relationships with Capital One to facilitate and complete agreements for the assignment of the Capital One Contract to SEG as part of the contemplated asset sale, and continuing his employment with Virtus through the September 30, 2012 agreed date. Accordingly, Bennett expected that proceeds payable from the proposed sale to SEG would be allocated to the payment of obligations to Bennett under the Bennett Agreement.

16. On or about September 30, 2012, Virtus and SEG signed and executed an Asset Purchase Agreement ("APA") providing for the sale of substantially all the assets of Virtus to SEG. A true and correct copy of the APA is attached hereto as **Exhibit B** and is hereby incorporated by reference. Closing under the APA occurred on or shortly after September 30, 2012.

17. Under the express terms of the APA, SEG purchased from Virtus "all tangible and intangible assets, properties, rights, Contracts and claims of the Seller, other than the Excluded Assets." (APA, sec. 1.1(a)). The "Assigned Contracts" purchased by SEG from Virtus included "all of the customer (i.e. client) Contracts related to the Business, … including the Capital One Contract." (APA, sec. 1.1(a)(ii)). Upon information and belief, the principal value of assets sold

and transferred by Virtus to SEG was comprised primarily of the "Assigned Contracts" as defined in the APA.

18. Notwithstanding the fact that the APA provided for the sale and transfer to SEG of "substantially all of the assets" of Virtus, over $200,000.00 in cash on hand was retained by Virtus as of the date of closing under the APA.

19. Instead of negotiating the APA to ensure that payment was made to Virtus of all consideration properly flowing from the sale of its assets, Garner instead orchestrated the form and content of the APA to ensure that virtually *all* consideration paid in connection with the sale of Virtus' assets was made to Garner personally. Garner structured the ultimate transaction in a manner in which the *only* measure of cash consideration was paid to Garner individually in the form of a "signing bonus" allegedly earned for Garner's agreement to accept employment with SEG and a Retained Book of Business Bonus directly and solely attributable to Virtus's existing contracts. Upon information and belief, over two million dollars ($2,000,00.00) in gross cash consideration was paid directly to Garner by SEG, thinly disguised as a "signing bonus" under an Employment Agreement executed contemporaneously with the APA. Virtus received not a dime, leaving it unable to satisfy its obligations to Bennett under the Bennett Agreement. The actions of Garner to effect a *de facto* transfer of all value attendant to the sale to himself, were made without the knowledge of Bennett and were actively concealed from Bennett.

20. Garner negotiated and structured the APA in such a way that the *only* apparent consideration provided to Virtus in consideration for the sale of virtually all its assets was an "Equity Grant" under which 28,261 of 10,140,472 issued and outstanding membership units in

SEG (the "SEG Stock") were to be transferred to Virtus.[1] Upon information and belief, the SEG Stock is held and owned by Garner personally, and *not* by Virtus.

21. Even if the SEG Stock were to be retitled in the name of Virtus, the stock is unable to be liquidated and can provide no cash which could pay the debts of Virtus.

22. As noted above, as part of his overall plan to facilitate payment of virtually *all* consideration payable due to the sale of Virtus' assets to himself personally, Garner negotiated an Employment Agreement with SEG dated September 30, 2012 (the "Employment Agreement") and executed simultaneously with the APA. A copy of the Employment Agreement is attached hereto as **Exhibit C** and is incorporated herein by reference.

23. The Employment Agreement provides for an extremely attractive compensation structure for Garner during a proposed two-year term of employment, to include:

   a. A "base salary" of $200,000.00;

   b. Annual bonus compensation to include i) a "Retained Book of Business Bonus" which could equal as much as $875,000.00 for each year depending on the retention and profitability of Virtus' contracts, ii) a "Commission Bonus" of up to five percent (5%) of the base salary, and iii) a Personal Revenue Generator Bonus" equivalent to twelve percent (12%) of personal billing revenues generated by Garner.

24. Provisions of payment of bonuses to Garner under the Employment Agreement are clearly tied to and dependent upon the value and retention of the Virtus' contracts by SEG. The "Retained Book of Business Bonus" was determined specifically with regards to the net profitability of the assigned Virtus consulting contracts and resulted in Garner being paid over

---

[1] The "Equity Grant" equals approximately three-tenths of one percent of the issued and outstanding membership units in SEG and may not be liquidated. One might reasonably label this consideration as "*de minimis.*"

$1,700,000.00 over the two-year span of the Employment Agreement, *in addition to* his base salary and other bonuses and commissions. Effectively, Garner has taken consideration properly payable to Virtus in exchange for its transfer and assignment of contract rights, and has personally appropriated those funds under the auspices of the Employment Agreement thereby leaving Virtus with literally no assets from which to satisfy its debts and obligations.

25. Notwithstanding the massive amount of base salary and annual bonus compensation payable to Garner, the most egregious act of self-dealing through the diversion of legitimate corporate assets is the provision for payment of a "Signing Bonus" to Garner under the terms of the Employment Agreement.

26. In addition to the provisions for base salary and annual bonuses as set forth hereinabove, the Employment Agreement additionally provided for Garner to be paid a signing bonus "*net of applicable withholding taxes,* in the amount of One Million Two Hundred Fifty Thousand Dollars ($1,250,000.00) (the "Signing Bonus")." Employment Agreement at par. 4(b). Upon information and belief, the gross value of the Signing Bonus after consideration for tax obligations made to effect the net payment was in excess of Two Million Dollars ($2,000,000.00).

27. Garner received payment in full of his signing bonus from SEG and has acknowledged having received "97 to 98 percent" of the Retained Book of Business Bonus of $875,000.00 per year for both years of the Employment Agreement. Upon information and belief, the combination of Signing Bonus, Retained Book of Business Bonus, base salary and other bonuses and commissions has resulted in the payment of almost Five Million Dollars ($5,000,000.00) from SEG to Garner personally during the two-year period following closing under the sale of Virtus' assets. Despite the fact that these amounts were tied directly to the

assignment, retention and profitability of the Virtus consulting contracts, Virtus did not receive so much as a penny in cash consideration for its sale and transfer of assets to SEG. Instead, *all* valuable consideration was transferred to Garner personally leaving Virtus with literally no material assets.

28. In his efforts to complete the stripping of virtually all assets from Virtus, Garner personally directed a distribution to himself of approximately Two Hundred Thousand Dollars ($200,000.00) in cash on hand in Virtus' accounts following the closing of the SEG sale. Effectively, Garner left sufficient assets in Virtus to effect payment of its then current liabilities after the closing, *but not to make payment of obligations under the Bennett Agreement,* and distributed the balance of net remaining cash in the company to himself. The effect of this last transfer by Garner was to leave Virtus with literally no assets from which its obligations under the Bennett Agreement could be paid. Upon information and belief, Garner structured the acts complained of herein in order to avoid and prevent payments to Bennett under the Bennett Agreement.

29. Garner induced Bennett to sign the Bennett Agreement and assist in facilitating the sale to SEG under the promise of payment from proceeds of sale, knowing full well that he was structuring the sale to SEG in such a manner as to leave Virtus without sufficient assets to make the promised payments. Garner's actions are the epitome of a "bait and switch" scheme under which Bennett was fraudulently induced to enter into and perform the Bennett Agreement only to be denied the benefits of his bargain by the wrongdoing of Garner.

30. At the time the Bennett Agreement was signed, Garner knew that Virtus would not have sufficient assets to make the contractual payments to Bennett.

31. During 2012 and 2013, payments were received by Bennett in an amount equivalent to fifty percent (50%) of the Up Front Cash Payment provided for under the Bennett Agreement. After that, payments stopped and no further payments were made voluntarily despite Bennett's demand for payment. Upon information and belief, the entirety of funds paid in 2012 and 2013 to Bennett came from Garner personally due to the fact that Virtus had no assets or funds available to effect payments.

32. After payments ceased without adequate explanation in 2013, and after Bennett's demand for payment went unheeded, Bennett commenced an action against Virtus and Garner in the Circuit Court for Loudoun County, Virginia. The Circuit Court lawsuit was stayed and referred to mandatory arbitration in accordance with the dispute resolution provisions of the Bennett Agreement.

33. On September 15, 2014, Mr. Bennett was awarded $387,500.00 against Virtus in the arbitration proceeding with an order that Garner had joint and several liability in the amount of $125,000.00. The arbitration award was confirmed by order of the Circuit Court for Loudoun County by order entered December 4, 2015 (the "Judgment"). A true and correct copy of the Judgment is attached hereto as **Exhibit D** and is hereby incorporated by reference.

34. Subsequent to the entry of the Judgment, Garner paid $125,000.00 to Bennett but no collection was ever made as against Virtus.

35. In order to enforce his judgment, in 2016, Bennett commenced post-judgment discovery including issuance of a subpoena duces tecum to Virtus and scheduling debtor's interrogatories. In response to the subpoena which asked for all of Virtus' financial statements from 2012 to the present, a one page balance sheet was the only document produced.

36. It only became clear from post-judgment discovery in May of 2016 that all cash assets of Virtus had been transferred to Garner for no consideration at a time when Virtus was indebted to Bennett and others.

37. Despite multiple discovery requests in the Arbitration, Mr. Garner did not provide Bennett with a final signed copy of the APA until May of 2016. Additionally, Garner did not provide a final signed copy of the Employment Agreement until post-judgment discovery. This agreement was the operative device used by Garner to facilitate payment and transfer of all of Virtus' assets and rights to himself and was intentionally withheld from Bennett until post-judgment discovery efforts were successful in compelling production of all documents related to the APA and sale of Virtus' assets to SEG.

38. To date, Virtus has not paid Mr. Bennett all sums that it owes to him.

39. The current amount owed pursuant to the Judgment is approximately $283,500 (consisting of $262,500 in principal and $21,000 in accrued interest).

### COUNT ONE – Alter Ego – Breach of Contract

40. The allegations contained in paragraphs 1 through 39 are incorporated by reference as if fully set forth herein.

41. At the time of closing of the sale of Virtus' assets to SEG, and due partly to the subsequent transfers of remaining cash reserves from Virtus to Garner, Virtus was grossly undercapitalized and without sufficient funds or assets to make payment of its known liabilities, including the Bennett Agreement.

42. Garner used Virtus as his instrumentality to evade obligations owed to Bennett. Effectively, Garner treated Virtus as his "alter ego" by utilizing the corporate entity to induce

Bennett into execution and performance under the Bennett Agreement, while at all times intending to divert the literal entirety of Virtus' asset value to himself.

43. It is now known that Garner was the *sole* beneficiary of consideration flowing from the sale of Virtus' assets to SEG. Despite the fact that Garner personally induced Bennett to cooperate and assist in the proposed sale, he never intended for Virtus to be able to make payments to Bennett under the Bennett Agreement and intended to avoid payments by transferring all of Virtus' value to himself.

44. Garner used Virtus to perpetrate a fraud on Bennett, as Garner knew that Virtus would never be able to perform under the Bennett Agreement.

45. Garner perpetuated his use of Virtus as his alter ego and instrumentality in his actions taken post-closing under the SEG sale. Because he had personally stripped Virtus of the entirety of its assets and value, Garner had to personally inject cash into Virtus to effect payments of the partial Up Front Cash Payment made to Bennett under the Bennett Agreement.[2] Additionally, after September 30, 2012 Garner personally paid payroll and third-party liabilities owed by Virtus. Garner's personal funding of these payments was necessitated by the fact that the entirety of Virtus' assets and value had been diverted to Garner personally, and to create the false impression that Virtus retained the ability to make payment of its financial liabilities.

46. Garner comingled his funds with those of Virtus by making payment of the expenses and liabilities outlined above.

47. Garner was (and is) the 100% owner of Virtus and controlled every action that Virtus took. He paid Virtus' expenses when it suited him, and he refused to pay them when it did not.

---

[2] The total of $87,500.00 was ultimately paid to Bennett post-closing and before Garner allowed Virtus to default on payment of the balance required under the Bennett Agreement.

48. Garner wrongfully and illegally distributed all of the funds of Virtus to himself before paying all of the creditors of Virtus in full.

WHEREFORE, for the foregoing reasons, Bennett respectfully requests that this Court find that Garner is the alter-ego of Virtus for the purposes of effecting collection of the Judgment rendered in connection with the Bennett Agreement, that the Court enter judgment in favor of Bennett and against James Garner personally in the amount of $262,500.00 with interest at 6% from December 4, 2015 until paid, and for such other relief as this Court deems just and equitable.

## COUNT TWO – Fraud in the Inducement

49. The allegations contained in paragraphs 1 through 48 are incorporated by reference as if fully set forth herein.

50. Garner falsely represented to Bennett that he would share the proceeds of the sale of Virtus' assets with Bennett if Bennett cooperated with and helped facilitate the sale to SEG. Bennett's involvement was particularly critical to the successful assignment of the Capital One Contract to SEG.

51. Garner induced Bennett to execute and perform the Bennett Agreement by promising payment to Bennett of an agreed portion of proceeds emanating from the SEG sale. However, Garner never intended for Virtus to make the contractual payments to Bennett. Garner's promise that Bennett would be paid the amounts set forth in the Bennett Agreement was a false statement of material fact that was made to Bennett with the intent that he rely upon such statement(s) and render performance under the Bennett Agreement.

52. Garner's promise of payment to Bennett was false because, at the time it was made, Garner had already begun implementing his plan to intentionally transfer all of the

consideration paid in connection with the SEG sale, and all the cash that belonged to Virtus, to himself. The literal stripping of all assets and value of Virtus for his personal benefit made it impossible for Virtus to meet its obligations under the Bennett Agreement.

53. Garner additionally concealed Virtus's financial information from Bennett in order to avoid disclosure that literally *all* cash consideration emanating from the SEG sale was to be paid to Garner personally.

54. If Bennett had known that Garner was going to transfer all of the cash out of Virtus and to himself, or that Garner intended to divert the consideration property payable from the SEG sale to himself, Bennett never would have entered into the Bennett Agreement.

55. Garner knew or reasonably should have known that if he had disclosed that Virtus would not have the assets to perform under the Bennett Agreement, Bennett would not have entered into it.

56. Garner personally benefitted from the Bennett Agreement as it facilitated the sale of Virtus' assets to SEG and allowed Garner to collect as much as Five Million Dollars ($5,000,000.00) in sums payable from SEG under the Employment Agreement.

57. Bennett reasonably relied upon the representations and statements of Garner and had a right to rely on these statements because of Garner's status as sole owner and officer of Virtus.

58. As a result of being misled by Garner, Bennett suffered actual damages in an amount exceeding three hundred thousand dollars, including the attorney's fees that were incurred in pursuing payment of amounts owed by Virtus.

59. Garner's behavior was fraudulent, unconscionable, and reprehensible. He acted with actual malice, knowing that Virtus would never pay the amounts owed to Bennett.

WHEREFORE, for the foregoing reasons, the Plaintiff respectfully requests that this Court enter judgment in favor of the Plaintiff and against James Garner for compensatory damages in an amount no less than $262,500 with interest at 6% from December 4, 2015, for punitive damages in the amount of $350,000, for Plaintiff's attorney's fees and the costs of this proceeding, and for such other relief as this Court deems just and equitable.

### COUNT THREE – Fraudulent Transfer(s) (Va. Code 55-80)

60. The allegations contained in paragraphs 1 through 59 are incorporated by reference as if fully set forth herein.

61. Garner was (and is) the 100% owner of Virtus and controlled every action that Virtus took.

62. Garner knew that Virtus was going to be insolvent shortly after the APA because of his planned diversion of virtually all of Virtus' assets and value to himself.

63. Virtus was, in fact rendered insolvent as a result of the transfers of its assets, rendering it unable to meet its financial obligations to Bennett under the Bennett Agreement.

64. Upon information and belief, Garner structured the APA in such a manner as to effect a fraudulent and improper transfer of virtually all consideration flowing from the sale of Virtus' assets to himself. The final effect of closing under the APA resulted in the following assets of Virtus being improperly transferred to Garner:

   a. The "Equity Grant" of SEG stock that was to be issued to Virtus was valueless as it is unable to be liquidated to pay claims and it is now owned by Garner; and

    b. The entirety of approximately Five Million Dollars ($5,000,000.00) in cash consideration paid in connection with the sale of Virtus' assets under the thinly disguised auspices of the Employment Agreement.

65. The Equity Grant and cash consideration paid to Garner under the provisions of the Employment Agreement constituted consideration that was properly payable to, and therefore property of, Virtus. Garner's actions in effecting a complete and total diversion of these assets to himself was made with the specific intent to delay, hinder or defraud Bennett in his efforts to collect liabilities owed under the Bennett Agreement.

66. Upon information and belief, and as represented hereinabove, the Equity Grant was of a *de minimis* value to Virtus in large part due to the extreme restrictions on and impediments to any right of liquidation or sale. The only true valuable consideration paid in connection with the SEG sale were the payments of cash consideration under the Employment Agreement.

67. Garner continues to retain the value that was paid to him by SEG in consideration for Virtus' assets.

68. In addition to the improper transfer of the Equity Grant and cash consideration flowing from the Employment Agreement, Garner further transferred $239,000.00 in remaining cash reserves of Virtus to himself shortly after or contemporaneously with the closing of the SEG sale. The effect of this transfer was to reduce Virtus' remaining assets post-closing to almost nothing so that no funds would be available to make payment to Bennett.

69. The $239,000.00 transfer made to Garner was an equity distribution from Virtus made at a time when remaining assets after the transfer were insufficient to make payment of remaining obligations of the company.

70. This $239,000 transfer was illegal under the Virginia Code as it was made during dissolution of Virtus and was a distribution to equity made before Virtus' liabilities had been paid. The $239,000.00 transfer was made and orchestrated by Garner with the intent to delay, hinder or defraud Bennett in his efforts to collect liabilities owed under the Bennett Agreement.

71. Bennett is entitled to an award of attorney's fees pursuant to Va. Code 55-82.1.

WHEREFORE, for the foregoing reasons, the Plaintiff respectfully requests that this Court enter judgment in favor of the Plaintiff and against James Garner for compensatory damages in an amount no less than $262,500.00 with interest at 6% from December 4, 2015, for Plaintiff's attorney's fees and the costs of this proceeding, and for such other relief as this Court deems just and equitable.

### COUNT FOUR – Voluntary Transfer (Va. Code 55-81)

72. The allegations contained in paragraphs 1 through 71 are incorporated by reference as if fully set forth herein.

73. Garner transferred the Equity Grant and cash consideration paid under the auspices of the Employment Agreement to himself so that such assets would be out of the reach of Bennett.

74. Garner transferred $239,000 to himself so that it would be out of the reach of Bennett.

75. The transfers identified herein were illegal under the Virginia Code as they were made during dissolution of Virtus and were transfers made to equity and ownership of Virtus before Virtus' liabilities had been paid.

76. Virtus was insolvent or rendered insolvent by the transfers described herein.

77. Bennett was an existing creditor at the time of the transfers alleged herein.

78. Bennett is entitled to an award of attorney's fees pursuant to Va. Code 55-82.1.

WHEREFORE, for the foregoing reasons, the Plaintiff respectfully requests that this Court enter judgment in favor of the Plaintiff and against James Garner for compensatory damages in an amount no less than $262,500.00 with interest at 6% from December 4, 2015, for Plaintiff's attorney's fees and the costs of this proceeding, and for such other relief as this Court deems just and equitable.

JOHN S. BENNETT
By counsel

/s/ Jeffery T. Martin, Jr.
Jeffery T. Martin, Jr., VSB #71860
HENRY & O'DONNELL, P.C.
300 N. Washington St., Suite 204
Alexandria, VA 22314
Telephone: (703) 548-2100
Fax: (703) 548-2105
JTM@henrylaw.com
Counsel to John S. Bennett